**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------ X

**UNITED STATES OF AMERICA**

   - against -

**THOMAS LUCKEY,**

          **Defendant.**

------------------------------------------------ X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/10/09
```

**OPINION AND ORDER**

**09 CR 889 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

Thomas Luckey is charged in a two-count indictment with being a felon in possession of ammunition, and possession with intent to distribute cocaine base.[1] He now moves to suppress physical evidence and statements obtained following a search of 1425 Amsterdam Avenue, apartment 1R, in Manhattan.[2] Without a search warrant, without exigent circumstances, and without permission, law enforcement officers entered this home only on the strength of an arrest

---

[1]   *See* 18 U.S.C. § 922(g)(1) (felon in possession of ammunition); 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(B) (possession with intent to distribute cocaine base).

[2]   Additionally, Luckey moves for severance of the counts for trial. In light of today's ruling on the motion to suppress, the Court does not reach this portion of Luckey's motion.

warrant for a fugitive.  Because the officers had no reasonable basis to conclude

that the fugitive was either residing in the apartment or there at the time of the

entry, the motion to suppress is granted.

## II.    BACKGROUND

The Court held a suppression hearing on November 9, 2009 and

received testimony from two witnesses:  Deputy United States Marshall Nicholas

Ricigliano, one of the officers who conducted the entry and search, and Jose

Leonor, the superintendent of 1425 Amsterdam Avenue and resident of apartment

2R.[3]

In December 2008, a magistrate in Cobb County, Georgia issued an

arrest warrant for a fugitive named Duron Perry Lee ("Lee" or "the fugitive").[4]

The warrant states that Lee is wanted on charges of robbery and aggravated

---

[3]    Both witnesses testified credibly and I fully credit their testimony,
except for one portion of Leonor's testimony, which I discount for reasons to be
discussed not related to his credibility.  The government intended to call several
officers present at the entry and search in question to testify.  However, only
Deputy Ricigliano testified because the government represented at the hearing —
and I so find — that the other officers would have only corroborated the testimony
of Deputy Ricigliano and would not have provided any additional information. *See*
11/9/09 Transcript of Suppression Hearing ("Suppression Tr.") at 43.

[4]    *See* 12/4/08 Criminal Warrant, No. 08-W-13921, Ex. B to 10/7/09
Declaration of Sarah Baumgartel, defendant's counsel ("Baumgartel Decl.").

assault.[5]  Investigators in Georgia determined that Lee had accessed MySpace —

an online social networking site — through two IP addresses in New York City in

July and August 2009.[6]  One of the IP addresses was registered to a Jose Leonor of

1425 Amsterdam Avenue, apartment 2R.[7]  The state investigators requested the

assistance of the United States Marshals Service in locating and arresting Lee.[8]

The marshals investigated Leonor and learned that he was the superintendent of

1425 Amsterdam Avenue and did not have any pending criminal matters.[9]  The

marshals queried police, commercial, and utility databases but did not find any

additional link between Lee and 1425 Amsterdam Avenue.[10]

At approximately 6 a.m. on September 3, 2009, federal marshals

along with New York City police officers (collectively "the officers") went to 1425

---

[5]      *See id.*

[6]      *See* Suppression Tr. at 7, 10, 34-36; 8/19/09 Report of Investigation
by Deputy United States Marshal Tony Simpson ("Simpson Rpt."), Ex. C to
Baumgartel Decl.; 9/9/09 Report of Investigation by Deputy United States Marshal
Nicholas Ricigliano ("Ricigliano Rpt."), Ex. D to Baumgartel Decl.

[7]      *See* Suppression Tr. at 7-8, 10; Simpson Rpt.; Ricigliano Rpt.  The
second IP address was traced to East 107th Street and Fifth Avenue.  *See*
Suppression Tr. at 35.

[8]      *See* Suppression Tr. at 7; Simpson Rpt.

[9]      *See* Suppression Tr. at 8, 11.

[10]      *See id.* at 8-9.

Amsterdam Avenue, apartment 2R, to attempt to arrest Lee.[11]  Upon arriving at the

apartment, the officers spoke with Leonor.[12]  Leonor permitted the officers to look

around his home and he answered the officers' questions.[13]  Leonor stated that he

had been the building superintendent for more than a decade and a half.[14]  The

officers asked Leonor about his Internet access, and Leonor stated that he had an

unsecured wireless connection in his apartment.[15]  The officers also asked Leonor

about the demographic make-up of the building and, specifically, whether any

African-Americans resided there.[16]  Deputy Ricigliano testified that because many

buildings in New York City are racially segregated, if Leonor had "said the

building is all Dominicans, it would give [the officers] reason to pause" in light of

Lee's being African-American.[17]  Leonor said African-Americans were across the

hall (a family with two children), above (an elderly woman), and below him.[18]

---

[11]     *See id.* at 11; Ricigliano Rpt.

[12]     *See* Suppression Tr. at 11; Ricigliano Rpt.

[13]     *See* Suppression Tr. at 11-12.

[14]     *See id.* at 12, 45-56; Ricigliano Rpt.

[15]     *See* Suppression Tr. at 48; Ricigliano Rpt.

[16]     *See* Suppression Tr. at 12-13.

[17]     *Id.* at 13.

[18]     *See id.* at 13, 52.

4

The officers showed Leonor a photograph of Lee.[19]  According to

Deputy Ricigliano's testimony:

> Q:  After showing [Leonor] the photo, what, if anything,
> did Mr. Leonor say about DeRon [sic] Lee?
> A:  He stated that he's seen him before.  And I said what
> apartment, and he said 1R, and he motioned with his index
> finger directly at the floor in front of him.
> Q:  What, if any, other apartments were mentioned to Mr.
> Leonor?
> A:  None.
> Q:  According to Mr. Leonor, when was the last time he
> saw the individual in the photograph?
> A:  I believe he wasn't sure of the exact date, but he had
> seen him in the past few weeks.
> Q:  Did Mr. Leonor ever tell you that DeRon [sic] Lee was
> not staying in the building?
> A:  No.[20]

Deputy Ricigliano understood Leonor to be saying that he had seen Lee in

apartment 1R within the past few weeks.[21]  Deputy Ricigliano acknowledged that

Leonor never explicitly stated that Lee was "staying" in apartment 1R but

explained that he believed, based upon his conversation with Leonor and his

---

[19]     *See id.* at 13, 48; Ricigliano Rpt.

[20]     Suppression Tr. at 13-14.  *Compare id. with* Ricigliano Rpt.
("[Leonor] stated that LEE could be found in apartment #1R in the same
building."); 9/3/09 Complaint, *United States v. Luckey*, 09 Mag. 2021 ("Compl.") ¶
2e ("Upon being shown a photograph of Suspect-1, [Leonor] informed the Officers
that Suspect-1 may be found in [Apartment 1R].").

[21]     *See* Suppression Tr. at 30-31.

experience in locating fugitives, that Lee was associated with someone in

apartment 1R.[22]  Deputy Ricigliano explained:

> [W]hen you're dealing with fugitives, generally speaking,
> they don't like move in to [sic] a place like you or I would
> move into a place.   They're associating with people.
> They're sleeping on their couches, they're sleeping on a
> spare bed, they're sleeping on the floor.  When I say he's
> associating, that's generally what I mean.  He's associated
> with that apartment. . . . [I]t's hard to say a fugitive resides
> at this address.    It's hard to use that term "reside" or
> "stay." . . .  In this particular case, this is my experience,
> when somebody's running from out of state, in this case,
> Georgia, and they come to New York, if they feel secure at
> a certain spot, they're going to stay there, unless it gets
> compromised, and that's been our experience, until, if they
> find out we were in the building and we missed them or
> something, they might move.  But if they're comfortable in
> this address and he believes he's okay because he's not in
> Georgia, then they do sometimes stay put.[23]

Leonor testified that 1425 Amsterdam Avenue is an apartment

complex with 130 units on eight floors plus the lobby.[24]  Inside the lobby there is a

security desk that is staffed twenty-four hours a day, as well as a management

office.[25]  All vistors must sign-in at the security desk in order to access the

---

[22]     *See id.* at 31-33.

[23]     *Id.* at 33-34.

[24]     *See id.* at 46.

[25]     *See id.* at 46-47.

building.[26]  Both the management office and the security desk maintain a list of tenants in the building.[27]

Leonor testified that on September 3, 2009 he told the officers that he had seen the face in the photo before but that he did not know the person.[28]  Leonor further testified that he specifically told the officers that the person in the photo did not live in the building.[29]  Leonor submitted a sworn declaration to the same effect.[30]  In that declaration, Leonor states he "did not tell the officers that they could find this person in apartment #1R."[31]  Leonor further testified at the hearing that he did not recall when he had last seen the person in the photo and that it might have been one to three years before.[32]  He did not tell the officers to "check apartment 1R" but rather told them to "check downstairs."[33]  By "downstairs",

---

[26]     *See id.* at 47.

[27]     *See id.* at 47-48.

[28]     *See id.* at 49.

[29]     *See id.*

[30]     *See* 10/6/09 Declaration of Jose Leonor ("Leonor Decl.") ¶ 3, Ex. D to Baumgartel Decl.

[31]     *Id.*

[32]     *See* Suppression Tr. at 49.

[33]     *Id.*

7

Leonor meant the security and other building staff, though he did not explicitly say that.[34]

> According to the transcription of Leonor's testimony, the following

questions and answers are recorded:

> Q:  After you told the U.S. Marshals to check downstairs,
> they asked you a follow-up question, didn't they?
> A:  Yes.  A moment after, the female officer, she ask me
> was he going to stay in 1R?  And I say yes, because I'm in
> 2R.  1R is below me.
> Q:  So they said 1R?
> A:  Yes.
> Q:  And you said yes?
> A:  Yes.[35]

Luckey argues that Leonor did not testify "'she ask me was he going to stay in 1R'

but that he actually stated, in relevant part, 'she ask me what is downstairs, 1R?

And I say yes, because I'm in 2R.  1R is below me.'"[36]  While I have some doubt

regarding the accuracy of the transcription, I shall assume that it is correct.

Nonetheless, I discount Leonor's testimony that he confirmed Lee was "staying" in

1R.  This testimony is inconsistent with (1) Leonor's other testimony and sworn

declaration that he knew Lee was not living in the building, that he had not seen

---

[34]      *See id.* at 49-50.

[35]      *Id.* at 51.

[36]      Defendant's Post-Hearing Reply in Further Support of His Motion to
Suppress ("Def. Post-Hearing Reply") at 2.

Lee in weeks (and possibly years), and that he did not tell the officers that Lee could be found in apartment 1R;[37] (2) Deputy Ricigliano's testimony that Leonor did not say Lee was "staying" in apartment 1R;[38] (3) the government's own notes from its pre-hearing interview with Leonor;[39] and (4) the Court's own recollection of the testimony.[40]

On the basis of all of the evidence presented and in the light most favorable to the government, I find that Leonor told the officers that he had seen Lee in connection with apartment 1R within the last few weeks and to "check

---

[37]    *See* Suppression Tr. at 49; Leonor Decl. ¶ 3.

[38]    *See* Suppression Tr. at 14, 31.

[39]    *See* Summary of Government's Interview of Jose Leonor on October 19, 2009, Ex. A to Def. Post-Hearing Reply ("The police then asked him if he knew where they could locate the person in the picture, and he stated 'you should check downstairs', Mr. LEONOR could not recall if he made any gestures with his hands while making that statement. According to Mr. Leonor a female officer then asked him 'what is downstairs, apartment 1R' and in answering the question he stated 'yes'. Mr. LEONOR stated that he was only answering the question the female officer asked and was not telling them to look for the person in the picture in apartment 1R.").

[40]    Additionally, the court reporter has amended the very line of the transcript at issue. Though the amendment was minor (from "she ask me was he to stay in 1R" to "she ask me was he going to stay in 1R"), the amendment nonetheless suggests that the reporter may have had difficulty transcribing the testimony at this point in the hearing. Also, though Leonor testified in English, this did not appear to be his native language, which may have caused or contributed to any misstatement by him or any error by the reporter.

downstairs," which the officers reasonably understood to mean "check apartment 1R".

After speaking with Leonor, the officers proceeded directly to apartment 1R.[41] The time was approximately 6:20 a.m.[42] Deputy Ricigliano testified that at that time the officers did not know who resided in the apartment, but they did learn that no outstanding criminal matters were related to apartment 1R.[43] The officers stood outside the apartment door and listened for several minutes; they knocked, first lightly then more forcefully and announced their presence.[44] At that point, one of the officers "reached over and checked the doorknob and saw that the door was unlocked and pushed the door open."[45] The officers entered the apartment.[46]

Inside, the officers did not find Lee. Instead, they found Luckey, his step-mother Dolores Luckey, and step-brother Donald Patrick Owens asleep in

---

[41]   *See* Suppression Tr. at 14; Ricigliano Rpt.

[42]   *See* Suppression Tr. at 14.

[43]   *See id.* at 14-15.

[44]   *See id.* at 15; Ricigliano Rpt.

[45]   Suppression Tr. at 15. *Accord* Ricigliano Rpt.

[46]   *See* Suppression Tr. at 16; Ricigliano Rpt.

three separate bedrooms.[47]  Dolores Luckey is the tenant of the apartment and has

lived there for many years. [48]  In Luckey's room, the officers recovered several

rounds of ammunition, suspected cocaine base, scales, and other drug

paraphernalia.[49]  The government does not contend that any of these items were in

plain view, but argues that Luckey consented to the search of his room.[50]

## III.   MOTION TO SUPPRESS

Luckey argues for suppression on the grounds that the officers' entry

into the apartment and the subsequent search violated the Fourth Amendment to

the United States Constitution.  Specifically, Luckey argues that the officers, with

only an arrest warrant for the fugitive, unlawfully entered apartment 1R.  Luckey

also vigorously disputes that he consented to the search of his room.[51]  I do not

---

[47]      *See* Suppression Tr. at 16-17; Ricigliano Rpt.

[48]      *See* Leonor Decl. ¶ 2; 10/7/09 Declaration of Thomas Luckey in
Support of Motion to Suppress ¶ 3, Ex. A to Baumgartel Decl.

[49]      *See* Suppression Tr. at 18; Ricigliano Rpt.  In Owens's room, the
officers recovered two handguns, several rounds of ammunition, a significant
quantity of suspected marijuana and packaging paraphernalia. *See* Suppression Tr.
at 17; Ricigliano Rpt. Owens was indicted on September 15, 2009, and is currently
being prosecuted in this district before the Honorable John G. Koeltl. *See* 9/15/09
Indictment, *United States v. Owens*, 09 Cr. 883 (JGK).

[50]      *See, e.g.*, Government's Response to Defendant's Pre-Trial Motions at
2; Compl. ¶ 2i.

[51]      *See, e.g.*, Memorandum of Law in Support of Defendant Thomas
Luckey's Motion to Suppress and Sever Counts at 8-10; Luckey Decl. ¶ 15.

reach the issue of consent, because I conclude that the officers had no reasonable

basis to believe that the fugitive was residing in apartment 1R and was there at the

time of entry.   In the absence of such a reasonable belief, the Fourth Amendment

does not tolerate an intrusion into a home based solely upon an arrest warrant.

A.    **Applicable Law**

The Fourth Amendment guarantees "[t]he right of the people to be

secure in their persons, houses, papers, and effects, against unreasonable searches

and seizures."[52]  While the Fourth Amendment protects an individual's privacy in a

variety of settings, "[i]n none is the zone of privacy more clearly defined than

when bounded by the unambiguous physical dimensions of an individual's home

— a zone that finds its roots in clear and specific constitutional terms: 'The right of

the people to be secure in their . . . houses . . . shall not be violated.'"[53]  Not only is

"'physical entry of the home . . . the chief evil against which the wording of the

Fourth Amendment is directed,'"[54] "respect for the sanctity of the home . . . has

---

[52]    U.S. Const. amend. IV.  *Accord Florida v. Jimeno*, 500 U.S. 248, 250 (1991) ("The touchstone of the Fourth Amendment is reasonableness.").

[53]    *Payton v. New York*, 445 U.S. 573, 589 (1980) (quoting U.S. Const. amend. IV).

[54]    *Id.* at 585-86 (quoting *United States v. U.S. Dist. Court for E. Dist. of Mich.*, 407 U.S. 297, 313 (1972)).

12

been embedded in our traditions since the origins of the Republic."[55]   "It is a 'basic

principle of Fourth Amendment law' that searches and seizures inside a home

without a warrant are presumptively unreasonable."[56]   Absent exigent

circumstances or consent, the "threshold [into the home] may not reasonably be

crossed without a warrant."[57]   "[T]he placement of this checkpoint between the

Government and the citizen implicitly acknowledges that an 'officer engaged in the

often competitive enterprise of ferreting out crime,' may lack sufficient objectivity

to weigh correctly the strength of the evidence supporting the contemplated action

against the individual's interests in protecting his own liberty and the privacy of his

home."[58]

     In *Payton v. New York*, the Supreme Court held that the Fourth

---

[55]    *Id.* at 601.  *Accord Wilson v. Layne*, 526 U.S. 603, 610 (1999)
(holding police may not bring media or another third party into a private dwelling
during the execution of a warrant unless the homeowner consents or the presence
of the third party aids execution of the warrant).

[56]    *Payton*, 445 U.S. at 586 (quoting *Coolidge v. New Hampshire*, 403
U.S. 443, 474-75 (1971)).  By contrast to private spaces, "it is also well settled that
objects such as weapons or contraband found in a *public* place may be seized by
the police without a warrant.  The seizure of property in plain view involves no
invasion of privacy and is presumptively reasonable, assuming that there is
probable cause to associate the property with criminal activity." *Id.* at 586-87
(emphasis added).

[57]    *Id.* at 590.

[58]    *Steagald v. United States*, 451 U.S. 204, 211-12 (1981) (quoting
*Johnson v. United States*, 333 U.S. 10, 14 (1948); citations omitted).

Amendment prohibits the warrantless entry by law enforcement officers into a suspect's home in order to make a routine felony arrest.[59]  However, where a detached judge has issued an arrest warrant based on probable cause, that warrant "implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."[60]

In *Steagald v. United States*, the Supreme Court held that without a search warrant or other justifying circumstances, law enforcement may not enter the home of a third party to search for the subject of an arrest warrant.[61]  Agents of the Drug Enforcement Administration ("DEA") entered Steagald's home based on an arrest warrant for Ricky Lyons, a fugitive whom the agents believed would be at that address.[62]  While searching the home for Lyons, the agents discovered cocaine; Steagald was convicted on federal drug charges.[63]

---

[59]     *See* 445 U.S. 573.

[60]     *Id.* at 603.  *Accord id.* at 602-03 ("[Where] there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that [the suspect's] arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law.").

[61]     *See* 451 U.S. at 212.

[62]     *See id.* at 206.  Specifically, based upon a tip from a reliable informant that Lyons would be at a certain telephone number for the next twenty-four hours, the DEA obtained from the telephone company the address that corresponded to the telephone number. *See id.*

[63]     *See id.* at 206-07.

14

As framed by the Court, "the narrow issue before us is whether an

arrest warrant — as opposed to a search warrant — is adequate to protect the

Fourth Amendment interests of persons not named in the warrant, when their

homes are searched without their consent and in the absence of exigent

circumstances."[64]  Even assuming there was probable cause to believe that Lyons

was at Steagald's home,[65] the Court held the entry and search unconstitutional:

> [W]hile the warrant in this case may have protected Lyons
> from an unreasonable seizure, it did absolutely nothing to
> protect [Steagald's] privacy interest in being free from an
> unreasonable invasion and search of his home.  Instead,
> [Steagald's] only protection from an illegal entry and
> search was the agent's personal determination of probable
> cause.  In the absence of exigent circumstances, we have
> consistently held that such judicially untested
> determinations are not reliable enough to justify an entry
> into a person's home to arrest him without a warrant . . . .[66]

Thus, "[t]he principle discussed in *Payton*, allowing officers to enter the residence

of the suspect named in the arrest warrant, does not authorize entry into a residence

in which the officers do not believe the suspect is residing but believe he is merely

visiting."[67]

---

[64]     *Id.* at 212.

[65]     *See id.* 212 n.6.

[66]     *Id.* at 213.

[67]     *United States v. Lovelock*, 170 F.3d 339, 344 (2d Cir. 1999).

Relying on the combined teachings of *Payton* and *Steagald*, the Second Circuit in *United States v. Lauter* explained that "[a]gents may enter a suspect's residence, or what they have reason to believe is his residence, in order to effectuate an arrest warrant where a reasonable belief exists that the suspect is present."[68]  In that case, "the search warrant clearly identified Lauter's residence as apartment 2R[]" at 499 Williams Avenue in Brooklyn.[69]  Prior to execution of the warrant, however, the officers learned from a reliable informant that Lauter had moved to a different apartment in the basement of the same building.[70]  The officers searched the basement apartment and recovered a shotgun and ammunition.[71]  Affirming the denial of Lauter's suppression motion, the Second Circuit held that *Steagald* was inapposite because the officers reasonably believed that they were entering Lauter's *residence* at a time when he was present.[72]

*Lauter* held officers do not need *probable cause* to believe that the suspect is at home; rather, "the proper inquiry is whether there is a *reasonable*

---

[68]    57 F.3d 212, 214 (2d Cir. 1995) (citing, for example, *United States v. Terry*, 702 F.2d 299, 319 (2d Cir. 1983); *United States v. Magluta*, 44 F.3d 1530, 1535 (11th Cir. 1995)).

[69]    *Id.* at 213.

[70]    *See id.*

[71]    *See id.* at 214.

[72]    *See id.* at 215.

*belief* that the suspect *resides* at the place to be entered to execute [the] warrant, and whether the officers have reason to believe that the suspect is present."[73] The reasonable belief standard of course requires less justification than the test for probable cause.[74]

Lauter does not explain why the reasonable-belief standard, and not the probable-cause standard, applies to an officer's belief that a suspect resides at and is within the place to be entered. Instead, *Lauter* cites principally to the Eleventh Circuit's decision in *United States v. Magluta*, which explains that the Supreme Court in *Payton* used the phrase "reason to believe" but did not define the term.[75] Taking its cue from *Payton*'s language, the Eleventh Circuit held that "in order for law enforcement officials to enter a residence to execute an arrest warrant for a resident of the premises, the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a *reasonable belief* that the location to be searched *is the suspect's dwelling*, and that the suspect is within the residence at the time of entry."[76]

A reasonable belief is established by assessing the totality of

---

[73]   *Id.* (emphasis added).

[74]   *See id.*; *United States v. Manley*, 632 F.2d 978, 983 (2d Cir. 1980).

[75]   *See* 44 F.3d at 1534.

[76]   *Id.* at 1535 (emphasis added).

circumstances.  A reasonable belief need not be a correct belief.[77]  Further, "[i]f the

circumstances are such that a reasonable person would doubt a given

representation, the officers cannot reasonably act upon that representation without

further inquiry; but the constitutional requirement is that they have a basis for a

reasonable belief as to the operative facts, not that they acquire all available

information or that those facts exist."[78]

As noted above, *Steagald*, decided the year after *Payton*, held that in

order for officers to enter the home of a third party in which officers believe the

arrestee is visiting, the officers must obtain a search warrant (issued with probable

cause), unless the entry is otherwise justified.[79]  The Supreme Court stressed in

*Steagald*:

> [A conclusion] that the police, acting alone and in the absence
> of exigent circumstances, may decide when there is sufficient
> justification for searching the home of a third party for the
> subject of an arrest warrant would create a significant potential
> for abuse.  Armed solely with an arrest warrant for a single
> person, the police could search all the homes of that
> individual's friends and acquaintances.  Moreover, an arrest
> warrant may serve as the pretext for entering a home in which
> the police have a suspicion, but not probable cause to believe,

---

[77]   *See Lovelock*, 170 F.3d at 343.

[78]   *Id.* at 344 (citations omitted).

[79]   *See* 451 U.S. at 213-16.

18

that illegal activity is taking place.[80]

There is a tension between *Steagald*'s concern for the rights of third parties and the reach of arrest warrants, on the one hand, and *Lauter*'s requirement that officers possess only a reasonable belief that a suspect is residing in the place to be entered and is present at the time of entry, on the other. *Steagald* and *Lauter* can be harmonized, however, because the officers in *Steagald* knew that they were entering the home of a third party,[81] whereas in *Lauter*, the officers had a reasonable belief that they were entering Lauter's *own* residence.[82]

Thus, a threshold question must be answered when law enforcement enters a home solely on the power of an arrest warrant:  Did the officers know or have reason to know that they were entering a home belonging to a third party but not the arrestee?  If the answer is yes, then *Steagald* controls.  The question of whether the officers knew or had reason to know that they were entering the home of a person *not* named in the arrest warrant is another way of approaching the first prong of the test stated in *Lauter*:  Where the officers had *no* reasonable basis to believe they were entering an arrestee's residence, *Steagald* requires a search warrant, consent, or exigent circumstances.  Of course "[w]hat a citizen is 'assured

---

[80]   *Id.* at 215 (citations omitted).

[81]   *See id.* at 206; *Lauter*, 57 F.3d at 216.

[82]   *See* 57 F.3d at 213-14.

by the Fourth Amendment . . . is not that no government search of his house will occur' in the absence of a warrant or an applicable exception to the warrant requirement, 'but that no such search will occur that is 'unreasonable.'"[83]

## B.    Analysis

It is undisputed that the officers entered apartment 1R without consent and without a search warrant. The government does not argue that there were any exigent circumstances.[84]  Therefore, the dispositive issue is whether the officers acted reasonably in light of the totality of the circumstances and the information they possessed. Specifically, the inquiry is whether the officers reasonably believed that Lee, the fugitive, was (1) residing in apartment 1R and (2) there on the morning of September 3, 2009.

According to Deputy Ricigliano's own testimony, the officers did *not* believe that Lee *resided* in apartment 1R, or that they thought such a belief was necessary under the law. Deputy Ricigliano admitted that he had no idea who actually "resided in apartment 1R" at the time they entered.[85]  When asked point-

---

[83]    *Lovelock*, 170 F.3d at 343-44 (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 183 (1990)).

[84]    Nor were there any exigent circumstances. There were at least six officers present during the attempted arrest of Lee. It would have taken only two of them to secure a warrant, and the rest could have easily remained at the building, possibly even apprehending the fugitive if he exited the apartment.

[85]    Suppression Tr. at 14.

blank by the Court why the officers entered the apartment, he stated "we believed that there was going to be *a chance* that DeRon [sic] Lee was going to be in the apartment."[86]  Deputy Ricigliano further testified that he thought that this gave him the right to enter the apartment, because he was acting in good faith.

What the officers did believe is that Lee was "associating" with apartment 1R and that there was a "chance" Lee was there the morning in question. The officers' belief implicitly acknowledges that apartment 1R was the home of a third party, rendering *Steagald* controlling.  Under *Steagald*, an arrest warrant cannot be executed at a third party's home unless the officers obtain a search warrant to enter based on probable cause because "[the arrest] warrant embodies no judicial determination whatsoever regarding the person whose home is to be searched."[87]  Because the officers had no search warrant to enter apartment 1R, their entry into that apartment was unconstitutional under *Steagald*.

Even if *Steagald* does not control, the entry and search was unconstitutional under the standard articulated in *Payton*, as elaborated in Second Circuit precedent such as *Lauter*.  The government argues that the officers acted reasonably based upon:

> their experience that early in the morning, fugitives are

---

[86]     *Id.* at 16 (emphasis added).

[87]     451 U.S. at 214 n.7.

often present and sleeping; information that the fugitive had been accessing the internet service of the superintendent, a resident of the apartment building; their experience that fugitives often steal the internet service of residents whose wireless internet service is left unprotected, but that the fugitives are often staying nearby; their discussion with the superintendent who told them that his wireless internet was unsecure, that he had seen the fugitive before and, most importantly, that the fugitive they were seeking was "staying" in the apartment "downstairs."[88]

According to the government, then, the basis of the officers' belief that Lee was residing in apartment 1R boils down to the wireless Internet evidence and the officers' conversation with Leonor, the superintendent. The government also relies on the fact that it was early in the morning to support the officers' belief that Lee was in apartment 1R.

---

[88]   Government's Post-Hearing Memorandum of Law in Opposition to Defendant's Pre-Trial Motions ("Gov. Post-Hearing Mem.") at 1-2. *Accord* Government's Post-Hearing Reply Memorandum of Law in Opposition to Defendant's Pre-Trial Motions at 1.
      In *Lovelock*, the Second Circuit observed that "[t]he colloquial use of [the word 'stays'] is consistent with 'resides.'" 170 F.3d at 343. In *Payton*, the Supreme Court held that an arrest warrant authorizes law enforcement to enter "a dwelling in which the suspect *lives* when there is reason to believe the suspect is within." 445 U.S. at 603 (emphasis added). Thus, depending on the manner in which someone is "staying" someplace, he or she may or may not be living or residing there. For example, if a suspect "stays" with someone else on occasion and has not been there in weeks, then the standard articulated in *Payton* may not be satisfied. Indeed, under *Steagald*, law enforcement personnel may not, armed solely with an arrest warrant, inject themselves into every home the arrestee has visited or stayed at occasionally.

Having learned that Leonor had an unsecure wireless Internet connection, the officers believed that Lee was in the vicinity of Leonor's apartment, utilizing Leonor's connection from outside apartment 2R. But such information alone clearly does not provide a sufficient basis for the officers to have entered apartment 1R. 1425 Amsterdam Avenue is a 130-apartment complex with nine floors. Lee could have been in any number of those apartments or in an entirely different building. There was no testimony or other evidence about the range of the signal coming from apartment 2R. Even assuming that Lee was within a floor's distance from Leonor's apartment, Lee could still have been in a variety of places and even more than one place. Additionally, the authorities' information regarding Lee's Internet usage was from July and August 2009, and the final date that Lee was detected tapping into Leonor's connection was around August 20.[89] Thus, at best, the officers' knew that Lee had been within the vicinity of 1425 Amsterdam Avenue, apartment 2R, approximately two weeks before the attempted arrest on September 3, 2009.

Of course, the wireless Internet evidence cannot be understood in isolation from Leonor's statements, the other principal piece of information that the officers relied upon when they entered apartment 1R. As I previously

---

[89]     *See* Suppression Tr. at 36.

explained, the evidence, in the light most favorable to the government, establishes that Leonor said that he had seen Lee in relation to apartment 1R a few weeks prior and that the officers should check apartment 1R. This information and the circumstances in which it was obtained do not support a reasonable belief that Lee was residing in apartment 1R and was there at the time of the entry.

To begin, I have some doubt as to the reasonableness of the officers' assumption that Leonor accurately identified the person in the photograph that they showed him. There was no evidence that Lee was a person that Leonor knew well, had interacted with, had seen close up, or even had seen on multiple occasions. To the contrary, Leonor told the officers that he did not know the person in the photograph, only that he had seen him before.[90] There is no evidence that the officers provided a physical description of Lee (such as height, weight, or age) to ensure that Leonor made an accurate identification. The officers apparently took no further steps to ascertain whether the person Leonor reported seeing was in fact the person they sought.

Even assuming Leonor made an accurate identification, his statements that he had "seen" the fugitive in connection to apartment 1R and that the officers should check that apartment were not sufficient to support a reasonable belief that

---

[90]    *See id.* at 13-14, 49.

24

Lee was residing there.  According to Leonor, he did not tell the officers that Lee was in apartment 1R or that they could find him there.[91]  But, even considering only Deputy Ricigliano's testimony, it was unreasonable for the officers to interpret Leonor's statements to mean that the fugitive was residing in apartment 1R and could be found there at that moment.  A statement that someone was "seen" in a particular place — and that the officers should check that place — does not reasonably support a belief that he resides there.

What is more, Leonor stated that he had not seen Lee in several weeks, which is entirely consistent with the officers' knowledge that Lee was last detected using Leonor's wireless Internet connection two weeks earlier.  Because the officers had no information connecting Lee to 1425 Amsterdam Avenue, let alone apartment 1R specifically, during the two weeks prior to the entry, they did not have a reasonable basis to believe he would be there at the time of the entry, despite the early hour.  Further, the officers had information pointing to other places in New York where Lee might have been staying.  Deputy Ricigliano testified that he knew Lee had a sister living in the Bronx.[92]  The officers also had information that Lee had been logging onto MySpace from another address in

---

[91]     See id. at 49; Leonor Decl. ¶ 3.

[92]     See Suppression Tr. at 34.

Manhattan.[93]

The quality and quantity of information here is deficient when compared to the cases cited by the government where courts have affirmed officers' entry into an apartment based on an arrest warrant.  For example, in *United States v. Lovelock*, the arrest warrant actually listed a "residence address," that address had apparently been provided by the arrestee to his probation officer, and the police confirmed that the suspect lived in the building by speaking to the building's two other tenants on the morning that they went to make the arrest.[94]  In *United States v. Lauter*, police had recent information from a reliable confidential informant familiar not only with the suspect, but also the building in which the suspect resided, that the suspect had just moved into a different apartment in the same building.[95]  In *United States v. Manley*, officers relied on an identification by a car dealership employee and records at the dealership, in addition to two neighbors' accurate description of the suspect's physical characteristics, car, and home.[96]  In *United States v. Pichardo*, officers had information from the Immigration and Naturalization Service (provided by the suspect) that matched

---

[93]     *See id.* at 35; *supra* note 7.

[94]     *See* 170 F.3d at 341-42, 344-45.

[95]     *See* 57 F.3d at 213, 215.

[96]     *See* 632 F.2d at 980, 983-84.

information from Con Edison indicating that the suspect lived at the address

entered.[97]  And in *United States v. Stinson*, a letter carrier confirmed that the

suspect received mail at the address where he reportedly lived with his girlfriend,

and his girlfriend was there when the officers arrived.[98]

   The cases cited by the government relating to entering a home in the

early morning are similarly off the mark.[99]  Courts have recognized that once

police officers have reason to believe that a suspect lives in a particular dwelling,

they may reasonably infer that he will be home early in the morning.[100]  However,

in each of the cases cited by the government, officers had more recent and reliable

information indicating the arrestee *resided at* a particular address.  In addition, in

most cases, the officers had specific information that led them to believe the

suspect would be home when they entered, and did not rely exclusively on the

early hour.[101]  But here, as I have noted, given that the officers had no information

---

  [97]  *See* No. 92 Cr. 354 (FPP), 1992 WL 249964, at *1 (S.D.N.Y. Sept. 22, 1992).

  [98]  *See* 857 F. Supp. 1026, 1027, 1031 (D. Conn. 1994).

  [99]  *See* Gov. Post-Hearing Mem. at 7.

  [100]  *See, e.g., Terry*, 702 F.2d at 319 ("The agents arrived at the apartment at 8:45 A.M. on a Sunday morning, a time when they could reasonably believe that Terry would be home.").

  [101]  *See Lauter*, 57 F.3d at 215 (noting that police had information from reliable confidential informant that suspect "was unemployed and typically slept

placing Lee in apartment 1R or even 1425 Amsterdam Avenue for weeks, the officers could not have had a reasonable belief that he would be in apartment 1R when they entered.

Further, while officers need not pursue every lead or corroborate reasonable beliefs,[102] the officers here failed to undertake even the simplest steps to confirm any impressions they had as to Lee's whereabouts. For instance, the officers did not speak to the security desk at 1425 Amsterdam Avenue (which is staffed twenty-four hours a day). A brief inquiry with the security personnel and showing her or him the photo of Lee might have confirmed or, as it were, refuted the officers' suspicion that Lee was in apartment 1R that morning. Nor did the officers peruse the visitor sign-in sheet or the tenant list. A check of these lists — especially the list of visitors — would also have been a quick and easy method to verify Lee's presence in the building. Even if Lee had not used his real name, the officers would have been able to determine whether any visitor was at apartment 1R that morning.

Additionally, as explained above, it does not appear from the

---

late"); *Terry*, 702 F.2d at 319 (noting that the suspect's child answered the front door, indicated his parents lived in apartment, and did not say they were away from home); *Stinson*, 857 F. Supp. at 1032 (noting that suspect's girlfriend answered door and confirmed suspect was within).

[102]     *See Lovelock*, 170 F.3d at 343.

testimony that the officers believed that Lee *resided* in apartment 1R when they entered, or that they thought such a belief was legally necessary. Rather, the officers thought that Lee was *associated with* apartment 1R and that there was *a chance* that he might be there. The government has cited no case, nor has the Court found one, upholding officers' entry and search of a third party residence based on an arrest warrant where the arrestee was believed to be associated with or visiting the resident. To extend the "reasonable belief" requirement of *Lauter*, let alone the probable-cause standard of *Steagald*, to include a "chance" and mere "association" would eviscerate the protection provided by the Fourth Amendment.

In the totality of circumstances, the officers had reason to know they were entering the home of a person not named in the arrest warrant. Under *Steagald*, to enter apartment 1R, the officers needed a search warrant, consent, or exigent circumstances, all of which they lacked. Even if *Steagald* does not control, the information possessed by the officers was insufficient to support a reasonable belief that Lee was residing in apartment 1R or there at the time of the entry.

## IV.   CONCLUSION

The Court is acutely aware that crime and evidence of crime is often concealed within homes, as the facts of this case seem to illustrate. Illegal activity within homes is of "grave concern to society, and the law allows such crime to be

29

reached on proper showing."[103]  "The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance.  When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a police[ officer] or Government enforcement agent."[104]  I have no doubt the officers here were acting in good faith to apprehend a fugitive and to enforce the laws that help to ensure a safe and orderly society.  Law enforcement must, however, conduct itself in accord with the commands of the Constitution.

For the reasons set forth above, Luckey's motion to suppress is granted.  The Clerk of the Court is directed to close this motion (document number 6).  A conference is scheduled for December 11, 2009 at 4:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            December 10, 2009

---

[103]   *Johnson*, 333 U.S. at 14.

[104]   *Id.*

## - Appearances -

**For the Government:**

Ryan P. Poscablo
Assistant United States Attorney
One St. Andrew's Plaza
New York, NY 10007
(212) 637-2634

**For Defendant Luckey:**

Sarah Baumgartel, Esq.
Federal Defenders of New York, Inc.
52 Duane Street, 10th Floor
New York, NY 10007
(212) 417-8772

31